IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LACY SWOGGER, as parent of P.W., a minor, | )<br>)<br>) |
| *Plaintiff*, | )<br>)     Civil Action No.  1:20-cv-128 |
| v. | )<br>) |
| ERIE SCHOOL DISTRICT, | )<br>) |
| *Defendant*. | )     **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Lacy Swogger, as parent of P.W, a minor, by her attorneys at the Mizner Law Firm, brings this action pursuant to the Americans with Disabilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973 against the Erie School District for discriminating against her son, P.W. on the basis of his disability and states:

## PARTIES

1. Plaintiff Lacy Swogger is an adult individual who resides in Erie County. She is the mother of P.W., a minor who lives with her.

2. Defendant Erie School District is a municipal agency, capable of suing and being sued, with headquarters located at 148 West 21st Street, Erie, Pennsylvania 16502. Defendant Erie School District is responsible for the negligent conduct of its employees, including without limitation Donald Orland.

## JURISDICTION AND VENUE

3. Plaintiff Lacy Swogger as the mother of P.W., a minor, brings this action pursuant to 28 U.S.C. 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., and

1

Section 504 of the Rehabilitation Act, 29 U.S.C. 794(a).

4. This Court has jurisdiction over these claims pursuant to 28 U.S.C. 1331 and 1343.

5. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

### FACTS

6. On March 5, 2020, P.W. was a seventeen year old junior at Erie High School.

7. P.W. has a primary disability of emotional disturbance and a secondary disability of Autism Spectrum Disorder ("ASD").

8. To assist P.W. with his education, he had an individual education plan ("IEP").

9. An IEP is a written plan developed to ensure that a child with an identified disability who is attending an elementary or secondary educational institution receives the necessary specialized instruction and related services.

10. According to P.W.'s IEP, "[d]ue to the severity of his disability [P.W.] receives his instruction for his core classes (ELA, math, science, and social studies) in the special education classroom because he needs a smaller, more structured classroom environment that the regular education classroom cannot provide. When provided with the appropriate accommodations/modifications, [P.W.] is able to work at or near grade level."

11. One of the services that P.W. needed to benefit from his special education program was transportation to and from school each day. This was necessary because P.W. does

not know how to either walk home or how to navigate the public bus service.

12. One of the accommodations of P.W.'s IEP was a "break card," which permitted him to: transition from his classes early, eat lunch in the office, be dismissed early to get on the bus at the end of the school day, go to the emotional support classrooms when he felt a break was needed or to the office of the principal, Principal Orlando.

13. Importantly, P.W. *trusted and was comfortable* with Principal Orlando, and was able to "decompress and refocus" when in Principal Orlando's office.

14. P.W. learned to trust Principal Orlando when Principal Orlando served as the principal at Wilson Middle School all three years that P.W. attended school there.

15. Principal Orlando was one of P.W.'s "go to" people at Wilson Middle School. Principal Orlando was always able to recognize an impending crisis and knew the appropriate approach to de-escalate problematic behavior and knew the appropriate interventions that worked with P.W. to help him refocus.

16. In addition to an IEP, P.W. had a Positive Behavior Support Plan.

17. A Positive Behavior Support Plan ("PBSP") is a written plan that outlines the strategies to be implemented for reducing problem behavior and for teaching positive skills designed to replace the behavior.

18. One of the antecedent (prevention) strategies in P.W.'s PBSP is to "Communicate expectations in nonthreatening manner, Avoid eye contact during tense situations, Provide [P.W.] with personal space."

19. The PBSP also had "Consequences (including procedures to follow) when the student performs the behavior of concern."

20. The Consequences were:

   a. If the target behaviors of noncompliance of classroom rules continue, [P.W.] will be prompted once.

   b. If the target behaviors continue, [P.W.] will receive a teacher detention at teacher's digression and/or [P.W.] will be directed to take a break in the Emotional Support classroom where he can utilize school support and/or make a phone call home.

   c. If the target behaviors continue, a phone call will be made to [P.W.] home.

   d. If the target behaviors continue, [P.W.] will be referred to the office for in school or out of school suspension.

   e. If the target behaviors continue, [P.W.] will be referred to law enforcement and or for expulsion.

21. Therefore, P.W. was instructed by Erie High staff that if he became frustrated or upset during the day, he should utilize his break card and go to the emotional support classroom or Principal Orlando's office to calm down.

22. In those situations, he was permitted to do "sudoku" puzzles at the principal's office to refocus.

23. P.W. rode the bus to and from Erie High each day, and his IEP and PBSP required that he utilize this school-provided transportation, rather than attempting to find another way home.

24. On the morning of March 5, 2020, P.W. was at Erie High having a meeting with Mr. Jones, the behavior specialist, after P.W. had been picked on by another student.

25. During the meeting, P.W. became upset as he tried to explain what had happened, felt that he was being falsely accused, and that he was not being given an opportunity to tell his side of the story.

26. P.W. became frustrated, overwhelmed and started to "melt down" and began swearing.

27. There are clear consistent behaviors that P.W. exhibits indicating an impending crisis all of which have been discussed with the IEP team so they know what to look for and when intervention may be needed. These behaviors include biting his nails, biting himself (usually in the arm), repetitive phrases, staring blankly over the top of his glasses, making a "growling" noise, completely shutting down and refusing to talk to anyone (often times this is viewed as noncompliance but if you give him a minute to process he will comply), and verbal aggression (swearing).

28. Once P.W. begins to enter "meltdown" mode, it is difficult to calm down without removing himself from the situation and engaging in a calming activity.

29. All of this information about P.W. was known and understood by Principal Orlando and other members of P.W.'s IEP team.

30. Therefore, P.W. did as he had been taught, and consistent with his IEP, he began walking to Principal Orlando's office, to sit and do his sudoku puzzles to calm down.

31. As he was walking to Principal Orlando's office, two City of Erie Police officers who work at Erie High School as resource officers to locate and confront P.W.

32. The City of Erie police officers are dressed and fully equipped, including protective vests.

33. Video footage produced by the Erie School District shows that P.W. was approached by two police officers in a hallway of Erie High at 9:41 a.m. as he was walking peacefully towards the principal's office.

34. P.W. had a pen in his hand down at his side before he was approached by the two police officers, as he was planning to do his sudoku puzzle one he got to the principal's office.

35. The video shows that P.W. was stopped by the two officers, and surrounded by them and two other men - Mr. Jones, the behavioral specialist, and Mr. Troop, the assistant principal.

36. While P.W. was standing in the hallway with his hands at his sides, completely surrounded by these four men, one of the Erie High administrators slapped his right hand from behind to knock the pen out of his hand.

37. P.W. had made no violent, sudden or threatening motion to necessitate or justify slapping P.W.'s right hand from behind.

38. Immediately thereafter, P.W. was physically grabbed by the same administrator and the two police officers and pushed against the wall, while P.W.'s pen and bag which had fallen to the floor were picked up.

39. P.W. was restrained by the police officers and one of the men for several seconds, and was released as Principal Orlando approached.

40. At that point, P.W. was directed to begin walking down the hall, with the two police officers, Principal Orlando, Mr. Troop, and Mr. Jones following close behind.

41. Video recordings show P.W. walking through the halls of Erie High to the front lobby, accompanied by the three administrators, the two police officers who had initially

accosted P.W., and a third police officer who joined in the procession to the front lobby.

42. At no point during this procession did P.W. do anything other than walk calmly and unassisted to the front lobby. He did not attempt to stop walking, change direction to a different location, make sudden or halting gestures or resist the police officers' directions in any way.

43. The six men and P.W. arrived in the school lobby at 9:42 a.m.

44. The six men stood in a half circle around P.W., who was standing facing them with his back to the door.



45. At 9:43 a.m., P.W. took out his cell phone to call his mother after he was advised that he must leave the school and go home.

46. However, Ms. Swogger was working, and did not see his message.[1]

47. After more discussion between the six men, one of the police officers opened one of the school's front doors.



48. P.W. was then escorted to the open door by the three police officers, as the principal, assistant principal and behavior specialist stood and watched.

49. At 9:44 a.m., P.W. was gently but firmly pushed out of the front door of Erie High, and the three police officers closed the door behind him, locking him out of the school.

---

[1] Ms. Swogger was unable to view her phone until about two hours later when she was on her lunch break.

8



50. The three school administrators, who had stood and watched an autistic student pushed out of the school during the school day, five hours before his bus was scheduled to take him home, turned and walked out of the lobby.

51. They did not wait for P.W. to make contact with his mother, or to arrange for any ride to take him home, despite the fact that P.W. was not permitted to find his own way home, but was required to take the school bus according to his Individual Education Plan.

52. Not knowing what else to do, P.W. sat on the school steps and began trying to contact other friends who he hoped would answer and help him find a ride home.

53. However, a few minutes later, one of the police officers came out and ordered him to leave school property. No knowing what else to do, P.W. walked off of the school property.

54. It is approximately 2.8 miles to walk from Erie High to P.W.'s home. However,

9

the reason that both the IEP and the PBSP require that the Erie School District provide transportation is that P.W. does not know how to either walk home or how to take or use public bus service.

55. Upon information and belief, no Erie High administrator attempted to call the people on P.W. 's emergency contact list, or took any action to monitor P.W. 's safety or security after he was kicked out of the school and off of school property.

56. The Erie School District failed to provide transportation to P.W. even though it is mandated in his Individual Education Plan and his Positive Behavior Support Plan.

57. Instead, at 9:47 a.m., Principal Orlando called Ms. Swogger's cell phone and left a voicemail, stating: "I'm just giving you a call to let you know that [P.W.] is on his way home, give me a call."

58. In fact, at 9:47 a.m., this was not true. P.W. was not on his way home.

59. Instead, he was being kicked off of school property while he tried to figure out what to do on his own, after he was unable to reach his mother because she was at work.

60. Ms. Swogger did not hear this message from Mr. Orlando until hours later on her lunch break.

61. Principal Orlando did not call Ms. Swogger's phone number on P.W. 's Emergency Contact List number, which was a particular extension at Ms. Swogger's employer.

62. Ms. Swogger called Erie High **thirteen (13) times** on March 5th and 6th, attempting to find out what had happened to her child.

63. Ms. Swogger never received any explanation of what P.W. is alleged to have done that required him to be kicked off of school property and left in the City of Erie unattended, far

10

from his home, and without any plan for how to get home.

64. Regardless of what P.W. is alleged to have done, Principal Orlando and other School District employees failed to follow "Consequences (including procedures to follow) when the student performs the behavior of concern set forth in P.W. 's PBSP.

65. To date, Ms. Swogger has not been informed by anyone at the Erie School District that P.W. had misbehaved on March 5, or that he was or is being disciplined in any way.

66. P.W. was overwhelmed with the sense of betrayal by Principal Orlando and the other employees or representatives of the Erie School District, was afraid about ever returning to Erie High, refused to return and is adamant about never returning.

67. P.W. is now a student of PA Cyber.

68. P.W. will most likely never be physically or emotionally able to attend a public high and will forever lose out on all of the attendant benefits thereby irreparable harming his personal and educational growth and development.

### COUNT I - VIOLATION OF THE REHABILITATION ACT

*Lacy Swogger*
*v.*
*Erie School District*

69. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

70. The Third Circuit has explained that denying a disabled student education merely because of the student's disability violations the Rehabilitation Act ("RA"):

> when a state fails to provide a disabled child with a free and appropriate education, it... violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education

11

that is guaranteed to all children that forms the basis of the claim. Therefore, a plaintiff can prove an RA violation where "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school."

*Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

71. Section 504 of the RA states:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

72. Under the regulations that accompany the RA, "qualified handicapped person" includes:

(2) With respect to public preschool[,] elementary, secondary, or adult educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under section 612 of the Education of the Handicapped Act;

34 C.F.R. § 104.3(l).

73. To recover under the RA, a student must demonstrate that the exclusion from school denied him participation on the basis of his disability; that is, that it was the result of some discriminatory act by school officials. See *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998) (holding that the disability must be the cause of the discrimination

12

or denial of benefits or services).

74. Courts within the Third Circuit have held that "intentional discrimination can be 'inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 827 F. Supp. 2d 409, 421 (E.D. Pa. 2011), *citing Barber ex rel. Barber v. Colorado Dep't. of Rev.*, 562 F.3d 1222, 1228-29 (10th Cir. 2009).

75. Deliberate indifference requires that an official with authority to address the alleged discrimination has "both knowledge that a harm to a federally protected right is substantially likely, and . . . fail[s] to act upon that likelihood." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

76. In this case, P.W. was excluded from Erie High School in violation of his written IEP, and was pushed out the front door, locked out and ordered to leave school property without any provision being made for his transportation home, or his mental or physical health and safety.

77. P.W. was subjected to this discriminatory exclusion from Erie High School on the basis of his disability, which caused him to not be able to maintain his composure and suppress his frustration as easily as other students.

78. Erie High School administrators discriminated against P.W. when they refused to accommodate his developmental disabilities and ignored his written IEP which specified the accommodations which he was to receive.

79. The adverse action which P.W. was subjected to by Erie High School's administrators was specifically in response to the manifestation of P.W.'s autism.

80. The Erie School District's administrators were aware that P.W's IEP contained the reasonable accommodations which he was entitled to receive, and which they were required to provide him.

81. By depriving P.W. of the reasonable accommodations specified in his IEP, the Erie School District's administrators were aware that they were depriving P.W. of the accommodations the law required.

82. Upon information and belief, there is no policy at Erie High School which contemplates or permits any student in P.W.'s situation to be denied an education and to be kicked out of school without any transportation or transfer of supervision.

83. Thus, the discriminatory action to which P.W. was subjected was unique, and he received worse treatment than other non-disabled students at Erie High School.

84. As a result of this discriminatory action, P.W. has suffered mental and emotional harm, including loss of trust in authority, and an unwillingness and fear of ever returning to school.

85. This fear will have a significant impact on his ability to meet his educational and personal goals, including his ability to live and work independently as an adult.

WHEREFORE, Plaintiff Lacy Swogger, as parent of P.W, a minor, requests that judgment be entered in her favor and against Defendant Erie School District, in an amount in excess of seventy-five thousand dollars ($75,000.00), along with her attorney fees, and all other relief permitted by law.

## COUNT II - VIOLATION OF THE AMERICANS' WITH DISABILITIES ACT

*Lacy Swogger*
*v.*
*Erie School District*

86. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

87. Defendant Erie School District is a "public entity" as defined by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131.

88. P.W. is a "qualified individual with a disability" under Title II. 29 C.F.R. §1630.2(j)(3)(iii).

89. Defendant Erie School District discriminated against P.W. "by reason of" his disability when its employees and agents violated his IEP, and evicted him from the school building and grounds in the first hour of the school day, because his autism was manifesting.

90. On March 5, 2020, Defendant Erie School District's employees and agents forced P.W. to leave the school building and grounds simply because of his autistic behavior.

91. P.W. was not being violent or aggressive, and yet Erie School District employees evicted him from the school building and grounds without following any of the protocols in his IEP, and without making contact with his mother or even calling her emergency contact number.

92. Defendant Erie School District administrators discriminated against P.W. when they refused to accommodate his developmental disabilities, ignored the written IEP which specified the accommodations which he was to receive.

93. The Erie School District's administrators were aware that P.W's IEP contained the reasonable accommodations which he was entitled to receive, and which they were required

to provide him.

94. By depriving P.W. of the reasonable accommodations specified in his IEP, the Erie School District's administrators were aware that they were depriving P.W. of the accommodations the law required.

95. The adverse action which P.W. was subjected to by Erie High School's administrators was specifically in response to the manifestation of P.W.'s autism.

96. Upon information and belief, there is no policy at Erie High School which contemplates or permits disabled students to be kicked out of school without any transportation or transfer of supervision; much less a disabled student like P.W.

97. Thus, the discriminatory action to which P.W. was subjected was unique, and he received worse treatment than other non-disabled students at Erie High School.

98. As a result of this discriminatory action, P.W. has suffered mental and emotional harm, including loss of trust in authority, and unwillingness and fear of ever returning to school.

99. This fear will have a significant impact on his ability to meet his educational and personal goals, including his ability to live and work independently as an adult.

WHEREFORE, Plaintiff Lacy Swogger, as parent of P.W, a minor, requests that judgment be entered in her favor and against Defendant Erie School District, in an amount in excess of seventy-five thousand dollars ($75,000.00), along with her attorney fees, and all other relief permitted by law.

                    Respectfully submitted,

                    MIZNER LAW FIRM

                    By: /s/ John F. Mizner

PA Supreme Court ID 53323
John F. Mizner
jfm@miznerfirm.com

PA Supreme Court ID 322823
Joseph Caulfield
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*

**JURY TRIAL DEMANDED**