## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LACY SWOGGER, as parent of P.W.,** | ) | |
| **a minor,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:20-cv-128-SPB** |
| **v.** | ) | |
| | ) | |
| **ERIE SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

Plaintiff Lacy Swogger ("Swogger") commenced this federal civil rights action against the Erie School District ("Defendant" or "School District") on behalf of her son, P.W., a former student of Erie High School.  In her complaint, Swogger alleges that the School District violated P.W.'s rights under Title II of the Americans with Disabilities Act of 1990 ("ADA") and § 504 of the Rehabilitation Act of 1973 ("RA"), resulting in emotional and mental harm to P.W.

The very narrow issue before this Court is whether the Title II of the ADA and §504 of the RA allow for the recovery of noneconomic damages to compensate for emotional harm. Arguing that the statutes do not permit such a recovery, the School District has moved to dismiss Swogger's complaint.  Swogger counters that damages for P.W.'s alleged emotional harm *are* recoverable based upon the facts alleged in the complaint.  Because this Court agrees with the position taken by Swogger, the School District's motion will be denied.

### I.    Background

P.W. is a former student of Erie High School who has a primary disability of emotional disturbance and a secondary disability of Autism Spectrum Disorder.  Compl. ¶7. The events giving rise to this lawsuit occurred on March 5, 2020, when P.W. was a seventeen-year old

student enrolled in Erie High School.  *Id*. ¶6.  As of that date, P.W. had an individual educational

plan ("IEP") and a positive behavior support plan ("PBSP") that were designed to accommodate

his disability-related limitations and assist with his education.  *Id*. ¶¶ 8-12, 15-23.  These plans

required, among other things, that P.W. receive transportation to and from school each day and

that certain strategies be employed to mitigate P.W.'s behavioral issues.  *Id*.

On March 5, 2020, P.W. experienced a "melt down" while in school and began swearing.

Compl. ¶¶ 24-26.  While on his way to the principal's office, he was confronted by two police

officers and two School District employees.  *Id*. ¶¶ 28-35.  During the confrontation, one of the

school officials slapped a pen out of P.W.'s hand.  *Id*. ¶36.  That official and two police officers

then briefly restrained P.W. but released him several seconds later, upon the school principal's

arrival.  *Id.* ¶¶ 38-39.   P.W. was then escorted to the front lobby and instructed to go home.  *Id.*

¶40-45.   P.W. called his mother, who was at work, but she did not immediately see the message.

*Id.* ¶¶ 45-46.  P.W. was then "gently but firmly" pushed out of the front door, which locked

behind him.  *Id.* ¶¶ 47-49.  The principal left a message for P.W.'s mother stating that P.W. was

"on his way home" and asking that she call him back; however, no other efforts were made to

arrange for P.W.'s safe transportation home.  *Id.* ¶¶ 50-51, 55-57.  Swogger did not hear the

principal's message until hours later, when she was on her lunch break.  *Id.* ¶60.

Meanwhile, P.W. sat on the school steps for several minutes as he attempted

(unsuccessfully) to contact other friends for a ride home.  Compl. ¶¶ 52-53.  He was ordered to

leave school property but was provided no transportation.  *Id.* ¶¶ 53-56.

P.W.'s home was located 2.8 miles from school, but P.W. did not know how to get there

and was incapable of riding public transportation.  Compl. ¶ 54.  Although P.W. apparently

arrived home, it is unclear from the complaint how he managed to do so.

2

Page | 2

Despite her repeated calls to the school administration's offices, Swogger was never given any explanation for P.W.'s ejection from the school's premises. Compl. ¶¶ 62-63, 65. Swogger alleges that, in any case, the principal and the other School District employees who were involved in his ejection failed to abide by the terms of P.W.'s PBSP. *Id.* ¶64.

As a result of the March 5, 2020 incident, P.S. felt betrayed by the principal and was afraid to return to school. Compl. ¶66. He subsequently enrolled in PA Cyber school and will likely never be physically and emotionally capable of attending a public high school. *Id.*. ¶¶ 67-68. Consequently, P.W. has lost out on the attendant benefits of a public education and suffered irreparable harm to his personal and emotional growth and development. *Id.*¶ 68.

This lawsuit ensued, with the filing of Swogger's complaint on May 27, 2020. ECF No. 1. In her pleading, Swogger alleges that the School District's actions constituted unlawful discrimination against P.W. in violation of Section 504 of the RA, 29 U.S.C. §794(a), and Title II of the ADA, 42 U.S.C. § 12181 *et seq*. Compl. ¶¶ 69-99. As relief for these alleged violations, Swogger seeks damages in excess of $75,000.00 and attorney fees. *Id.* at p. 16.

The School District filed the pending motion to dismiss and supporting brief on August 27, 2020. ECF Nos. 8, 9. Therein, the School District argues that, as a matter of law, Swogger may not recover emotional distress damages or attorney fees under the RA or ADA. ECF No. 9. Because Swogger has not sought any other form of relief, the School District argues that the complaint must be dismissed.

Swogger filed her brief in opposition to the motion on September 16, 2020. ECF No. 15. On September 30, 2020, the School District filed its reply. ECF No. 16. As a result of these filings, the issues have been joined, and the Defendant's motion is ripe for adjudication.

## II.        Standard of Review

When considering a Rule 12(b)(6) motion, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 526–27 (3d Cir. 2018) (internal quotation marks and citations omitted).  In order to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (*citing Twombly*, 550 U.S. at 556).

## III.        Discussion

At issue is whether Title II of the ADA and Section 504 of the RA allow for the recovery of noneconomic damages in cases of intentional discrimination that results in emotional harm to the aggrieved individual.  The U.S. Court of Appeals for the Third Circuit has not yet addressed this question and, as discussed below, the federal courts of appeals are split on the issue.

Section 202 of the ADA prohibits public entities from discriminating against any "qualified individual with a disability" in connection with the entity's "services, programs, or activities."  *See* 42 U.S.C. § 12132.  Where violations occur, Section 203 of the ADA affords aggrieved individuals the same "remedies, procedures, and rights" as are set forth in § 505 of the RA, 29 U.S.C. §794a.  *See* 42 U.S.C. § 12133.

4

Section 504 of the RA prohibits discrimination against any "qualified individual with a disability" in connection with a federally funded "program or activity." *See* 42 U.S.C. §794(a). Section 505(a)(2) of the RA provides aggrieved individuals the same "remedies, procedures, and rights" as are "set forth in title VI of the Civil Rights Act of 1964." *See* 29 U.S.C. § 794a(a)(2).

The upshot of these provisions is that "the remedies for violations of § 202 of the ADA and § 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which prohibits racial discrimination in federally funded programs and activities." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). The next question to be answered is what remedies are permissible under Title VI.

In *Barnes v. Gorman, supra,* the Supreme Court addressed this issue in the context of a claim for punitive damages under Title II of the ADA and Section 504 of the RA. In determining whether punitive damages are permitted under Title VI (and thus, under the ADA and the RA), the Court began by acknowledging "'the traditional presumption'" that courts may award "'*any appropriate relief* for violations of a federal right.'" 536 U.S. at 185 (quoting *Franklin v. Gwinnett County Public Schools,* 503 U.S 60, 73 (1992)) (emphasis in the original); *see Franklin*, 503 U.S. at 70-71 ("The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."). But the Court drew further guidance from the fact that Title VI was enacted by Congress under its "Spending Clause" powers:

> We have repeatedly characterized this statute and other Spending Clause legislation as "much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." . . . Just as a valid contract

5

> requires offer and acceptance of its terms, "[t]he legitimacy of Congress' power to
> legislate under the spending power ... rests on whether the [recipient] voluntarily
> and knowingly accepts the terms of the 'contract.' ... Accordingly, if Congress
> intends to impose a condition on the grant of federal moneys, it must do so
> unambiguously."

536 U.S. 186 (internal citations omitted; second and third ellipsis in the original; alterations in

the original).

Just as the Court had, in other cases, utilized the contract analogy to determine the

general availability of a damages remedy and "the scope of conduct for which funding recipients

may be held liable" under Spending Clause legislation, the Court concluded in *Barnes* that the

same contract analogy would apply for purposes of determining "the scope of damages

remedies." 536 U.S. at 187. "One implication" of this analogy, according to the Court, was that

"a remedy is 'appropriate relief,' . . . only if the funding recipient is on notice that, by accepting

federal funding, it exposes itself to liability of that nature." *Id.* The Court further explained that

"[a] funding recipient is generally on notice that it is subject not only to those remedies explicitly

provided in the relevant legislation, but also to those remedies traditionally available in suits for

breach of contract." *Id.* Following this logic, the Court contrasted compensatory damages and

injunctive relief -- both of which are "[f]orms of relief traditionally available in suits for breach

of contract" -- with punitive damages, which "are generally not available for breach of contract."

*Id.* (citations omitted). Thus, the contract analogy would not allow for the recovery of punitive

damages under Title VI.

The Court further opined in *Barnes* that Title VI did not provide an "implied" punitive

damages remedy:

> Not only is it doubtful that funding recipients would have agreed to exposure to
> such unorthodox and indeterminate liability; it is doubtful whether they would even
> have accepted the funding if punitive damages liability was a required condition.

6

> "Without doubt, the scope of potential damages liability is one of the most significant factors a school would consider in deciding whether to receive federal funds." . . . . And for the same reason of unusual and disproportionate exposure, it can hardly be said that community standards of fairness support such an implication.

*Id*. at 188 (internal citation omitted). Accordingly, the Court concluded that "Title VI funding recipients have not, merely by accepting funds, implicitly consented to liability for punitive damages.[ ]" *Id.* (internal footnote omitted). It followed that, because punitive damages could not be awarded in suits brought under Title VI of the Civil Rights Act, they may not be awarded in suits brought under §202 of the ADA and §504 of the RA. *Id.* at 189.

The U.S. Court of Appeals for the Eleventh Circuit subsequently applied the teachings of *Barnes* in a case involving a claim for noneconomic damages under the RA. *Sheely v. MRI Radiology Network, P.A.* involved a blind plaintiff who sued, in relevant part, for redress of emotional harm that allegedly resulted from the defendant preventing the plaintiff from bringing her guide dog into a diagnostic imaging facility. 505 F.3d 1173 (11th Cir. 2007). To determine whether emotional harm damages were available under Section 504 of the RA, the court acknowledged that it would need to ascertain whether such damages are available to private litigants suing under Title VI. *See id*. at 1191. Based upon a lengthy analysis which included three central points, the Court held that emotional distress damages are indeed compensable under Title VI and, thus, the RA. 505 F.3d at 1198.

First, the *Sheely* Court addressed the Supreme Court's fundamental concern in *Barnes* that federal funding recipients have fair notice of any liability to which they may potentially be subjected. To that end, the court considered emotional distress to be a "predictable, and thus foreseeable, consequence of discrimination." 505 F.3d at 1199. The court further observed that, whereas punitive damage awards "may range in orders of indeterminate magnitude," emotional

7

distress damages, "like other forms of compensatory damages, are designed to make the plaintiff whole, and therefore bear a significant and altogether determinable relationship to events in which the defendant entity participated and could have foreseen."  *Id.* at 1199-1200 (quoting *Barnes*, 536 U.S. at 190-91 (Souter, J., concurring)) (additional internal quotation marks omitted).

Second, the *Sheely* Court pointed out that the contract analogy utilized by the Supreme Court was not intended to govern all aspects of suits brought under Spending Clause legislation. 505 F.3d at 1200 and n. 27 (quoting *Barnes*, 536 U.S. at 188 n.2, *id.* at 186, 191, and 192-93). But even assuming that contract law *did* apply directly to the question at hand, the *Sheely* Court concluded that common law principles would support the availability of emotional harm damages in situations involving intentional violations of §504.  *Id.* at 1200.  The court noted that, while emotional harm damages do not typically lie for breach of a contract, such damages *are* available when the nature of the contract is such that emotional distress is foreseeable.  *See id.* at 1200-01 (discussing authority).  In particular, the court cited cases involving the breach of personal contracts where the subject matter of the agreement is not pecuniary gain but rather a matter of mental concern or solicitude.  *Id.* at 1200-01 and n. 28 (citing authority).  The court opined that, "the notable and longstanding exception permitting emotional damages for breach of personal contracts sharply distinguishes the emotional damages Sheely seeks from the punitive damages the Supreme Court refused to award under the RA in *Barnes*.[ ]" *Id.* at 1202 (footnote omitted).

Third, "[h]aving concluded that neither the contract *metaphor* the Supreme Court has found useful in determining the available remedies under Spending Clause legislation nor *actual* contract law bars recovery of emotional damages," the *Sheely* Court turned to the longstanding

8

presumption, reaffirmed in *Barnes,* that "'federal courts may use *any* available remedy to make good the wrong done.'"  505 F.3d at 1203 (quoting *Barnes*, 536 U.S. at 189) (emphasis in the original by the *Sheely* Court).  The court contrasted punitive damages -- which are not compensatory in nature and, therefore, not within the scope of presumptively available remedies -- with emotional distress damages, which the court viewed as "plainly a form of compensatory damages designed to 'make good the wrong done.'"  *Id.* at 1203.  The court considered such damages "particularly appropriate where, as here, emotional distress is the only alleged damage to the victim and thus, the *only* 'available remedy to make good the wrong done,' . . . and the *only* way to 'put private parties in as good a position as they would have been had the contract been performed[.]"  Id. (quoting *Franklin,* 503 U.S. at 66 and *Barnes,* 536 U.S. at 189).

Based upon the foregoing points, the *Sheely* Court concluded that "emotional damages are available to make whole the victims of violations of §504 of the Rehabilitation Act[.]"  505 F.3d at 1204.  The U.S. Courts of Appeals for the First, Second and Seventh Circuits have apparently arrived at the same conclusion, albeit in opinions which did not expound on the courts' reasoning.  *See, e.g., Reed v. Columbia St. Mary's Hosp.,* 782 F.3d 331, 337 (7th Cir. 2015) (finding plaintiff's claims under Title III of the ADA and Section 504(a)(2) of the Rehabilitation Act legally sufficient based upon plaintiff's allegations that defendant hospital, with knowledge of her disability, purposely denied her access to the computer that helped her communicate); *Carmona-Rivera v. Commonwealth of Puerto Rico,* 464 F.3d 14, 17 (1st Cir. 2006) ("We have previously held that under Title II [of the ADA], non-economic damages are only available when there is evidence 'of economic harm *or animus toward the disabled*.'") (quoting *Nieves-Marquez v. Puerto Rico,* 353 F.3d 108, 126-27 (1st Cir. 2003)) (emphasis added); *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 580-81 (2d Cir. 2003) (affirming

9

district court's award of compensatory damages "in its entirety," where such award included an award of compensatory damages for emotional pain and suffering under Title II of the ADA).

More recently, however, the U.S. Court of Appeals for the Fifth Circuit has taken a contrary position with respect to the availability of emotional distress damages.  In *Cummings v. Premier Rehab Keller, P.L.L.C.,* the court considered whether a claim for noneconomic damages is available for violations of Section 504 of the RA and Section 1557 of the Patient Protection and Affordable Care Act of 2010 ("ACA"), 42 U.S.C. §18116.[1]  Following *Barnes,* the *Cummings* Court viewed "the fundamental question in evaluating damages in the context of Spending Clause legislation" as "whether 'the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature.'" 948 F.3d at 677 (quoting *Barnes,* 536 U.S. at 187).  The court went on to conclude that, "[b]ecause emotional distress damages, like punitive damages, are traditionally unavailable in breach-of-contract actions, . . . [the defendant] was not 'on notice' that it could be liable for such damages."  *Id.*  Citing the Restatement (Second) of Contracts, the court acknowledged two "exceptional situations" where damages for emotional harm are recoverable, namely:  (i) situations where the emotional disturbance accompanies a bodily injury; and (ii) situations where the contract or breach is such that the plaintiff's "serious" emotional disturbance was a "*particularly likely* result."  *Id*. at 677-78 (quoting Restatement §353 cmt. a) (emphasis by the court) (internal quotation marks

---

[1] Under 1557 of the ACA, "an individual shall not, on the ground prohibited under . . . [§504 of the RA], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. §18116(a).  This provision, like § 504 of the RA, was passed pursuant to Congress' powers under the Spending Clause of the U.S. Constitution.  *See Cummings,* 948 F.3d 673, 676 (5th Cir. 2020) (noting that "Section 504 of the RA and §1557 of the ACA are Spending Clause legislation").

10

omitted).  However, the *Cummings* Court did not feel "obligated to apply those exceptions" in view of the fact that the Supreme Court's contract-law analogy was merely a "metaphor."  *Id*. at 678.  The key issue, the court noted, was notice, and it concluded that "funding recipients are not 'on notice' that they might be liable for such a rare and narrow exception to the prohibition of emotional distress damages."  *Id*.  The court went on to observe that "contract law also has exceptions for awarding punitive damages[,]" but "*Barnes* stuck to the general rule, which prohibits punitive damages."  *Id.*  The *Cummings* Court therefore saw "no reason to go down the rabbit-hole of 'exceptions' to the general rule that emotional distress damages are unavailable for breach of contract when the Court in *Barnes* did not do so with regard to punitive damages."  *Id*.

The *Cummings* Court acknowledged, but expressed its disagreement with, the Eleventh Circuit's contrary holding in *Sheely*.  According to the *Cummings* Court, *Sheely* improperly conflated two distinct "foreseeability issues," -- namely the foreseeability of possible emotional distress versus the foreseeability that, by accepting federal funds, the recipient would be liable for emotional distress damages.  948 F.3d at 679.  Acknowledging the presumption that allows federal courts to use "any available remedy to make good the wrong done," *id.*, the *Cummings* Court concluded that this rule could not be used as a "vehicle for importing remedies that have already been rejected."  *Id.* at 680.  Consequently, the *Cummings* Court held that emotional distress damages were not available under the RA or the ACA and affirmed the dismissal of the plaintiff's claims.  *Id*.

In the case at bar, the School District urges this Court to adopt the reasoning of the Fifth Circuit in *Cummings*.  Defendant also refers the Court to *Khan v. Albuquerque Pub. Schools*, No. CV-03-0118, 2003 WL 27384754, at *7 (D.N.M. Dec. 31, 2003) (holding that punitive damages and emotional distress damages are an inappropriate relief in actions brought pursuant to Title II

of the ADA and § 504 of the RA) and *Bell v. Bd of Educ. of the Albuquerque Public Schools*, 652 F. Supp. 2d 1211, 1212 (D.N.M. 2008) (following *Khan* and granting summary judgment in defendant's favor relative to plaintiff's claim for emotional distress damages under §504 of the RA and Title VI of the Civil Rights Act).

Page | 12

Plaintiff, on the other hand, urges the Court to follow the reasoning of the Eleventh Circuit in *Sheely*.  Plaintiff further directs the Court to numerous other district court and appellate decisions supporting the availability of emotional distress damages, some of which were rendered prior to the Supreme Court's decision in *Barnes*.  *See* ECF No. 15 at 5-7 (citing, in order of federal circuit: *Carmona-Rivera v. Puerto Rico*, *supra; Nieves-Marquez v. Puerto Rico, supra; Tsombanidis v. W. Haven Fire Dep't, supra; Stamm v. N.Y.C. Transit Auth ,* 2013 U.S. Dist. LEXIS 8534 (E.D.N.Y. Jan. 18, 2013) ("Before us today is narrower still: whether a subset of compensatory damages—non-economic compensatory damages—is available under § 504 of the Rehabilitation Act for intentional discrimination. We hold that it is."); *Hernandez v. City of Hartford ,* 959 F. Supp. 125 (D. Conn. 1997) ("Since claims for compensatory and punitive damages are proper under § 504 of the Rehabilitation Act, they are likewise appropriate under ADA."); *Worthington v. City of New Haven,* 1999 U.S. Dist. LEXIS 16104, at *47-48 (D. Conn. Oct. 5, 1999) ("Her testimony revealed that she has suffered pain, humiliation, emotional distress, and financial hardship as a result of the defendant's violations of federal law. Accordingly, the Court awards Worthington compensatory damages in the amount of $150,000.");  *Neal v. Univ. of N.C.*, 2018 U.S. Dist. LEXIS 73063 (E.D.N.C. May 1, 2018) (holding that allegations of discrimination were sufficient to support monetary damages under the ADA, where plaintiff sought "non-economic damages in the form of humiliation, embarrassment and emotional distress, as a result of her dismissal from the MSW Program");

12

*Johnson v. City of Saline*, 151 F.3d 564, 572-73 (6ᵗʰ Cir. 1998) (Where plaintiff "sought compensatory and punitive damages for physical damage...psychological and emotional trauma, humiliation and embarrassment, anxiety, and pain and suffering… [we] hold that compensatory damages are available under Title II of the ADA, by extension from their availability under the Rehabilitation Act"); *Reed v. Columbia St. Mary's Hosp., supra; Reed v. Illinois* , No. 12-cv-7274, 2016 U.S. Dist. LEXIS 60875, at *14 (N.D. Ill. May 9, 2016) (" the Court declines to find, as a matter of law, that Plaintiff is not entitled to emotional distress damages to the extent her claims allege intentional discrimination under the ADA and the Rehabilitation Act."); *Peacock v. Terhune*, 2002 U.S. Dist. LEXIS 1136 (E.D. Cal. Jan. 23, 2002) ("These allegations raise an inference that defendants intentionally inflicted emotional distress upon Fratus, and therefore plaintiff's claim for emotional distress damages may go forward.")).

Having carefully reviewed the foregoing authorities and the parties' respective arguments, the Court finds *Sheely's* holding to be the more persuasive one concerning the availability *vel non* of emotional distress damages under §202 of the ADA and §504 of the RA. In *Barnes,* the Supreme Court distinguished punitive damages -- which are generally unavailable in contract actions -- from compensatory damages and injunctions, both of which are "forms of relief traditionally available in suits for breach of contract." 536 U.S. at 187. The Supreme Court explained that,

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient compensates the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure. See *Guardians* [*Ass'n v Civil Serv. Comm'n of New York City,* 463 U.S. 582, 633 (1983)] (Marshall, J., dissenting) ("When a court concludes that a recipient has breached its contract, it should enforce the broken promise by protecting the expectation that the recipient would not discriminate. ... The obvious way to do this is to put private parties in as good a position as they would have been

13

> had the contract been performed"). Punitive damages are not compensatory, and are therefore not embraced within the rule described in *Bell* [*v. Hood*, 327 U.S. 678, 684 (1946) (stating that, "where legal rights have been invaded," federal courts may utilize "any available remedy to make good the wrong done"].

*Id.* (ellipsis in the original).  *See also* Restatement (Second) of Contracts § 355 (1981) ("The purposes of awarding contract damages is to compensate the injured party. . . . For this reason, courts in contract cases do not award damages to punish the party in breach or to serve as an example to others unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.").

Unlike punitive damages, emotional distress damages are designed to compensate the party who is wronged.  *See Sheely,* 505 F.3d at 1199 (noting that "emotional damages, like other forms of compensatory damages, are designed to make the plaintiff whole").  Like the *Sheely* Court, this Court believes that these types of awards are "particularly appropriate where, as here, emotional distress is the only alleged damage to the victim and thus, the only 'available remedy to make good the wrong done,' . . . and the only way to 'put private parties in as good a position as they would have been had the contract been performed[.]"  *Id*. at 1203 (quoting *Franklin*, 503 U.S. at 66 and *Barnes*, 536 U.S. at 189).

This Court further agrees with the *Sheely* Court's conclusion that public entities and recipients of federal funding are on fair notice when they violate Section 202 of the ADA or Section 504 of the RA that they are potentially liable for the aggrieved individual's emotional harm.  Under well-established principles of contract law, emotional distress damages are available when the nature of the contract is such that a breach will foreseeably result in significant emotional harm to the non-breaching party.  *See, e.g.,* Restatement (Second) of Contracts § 353 (1981) (recognizing that recovery for emotional disturbance is permitted when the contract breach is of such a kind that "serious emotional disturbance was a particularly likely

14

result"); 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.17 (3d ed. 2004) (explaining that some courts have awarded emotional damages where the nature of the contract made emotional distress a "particularly likely result" of breach, while others have awarded such damages based on the "reprehensible" nature of the breach); 24 Richard A. Lord, *Williston on Contracts* § 64:7 (4th ed. 2002) ("[W]here other than pecuniary benefits are contracted for, damages have been allowed for injury to a person's feelings."); 25 C.J.S. *Damages* § 100 (explaining that "[w]here the character of the contract is of such a nature that a natural and probable consequence of the breach will be to inflict mental pain or anguish ..., the parties may be presumed to have contracted with respect to mental anguish as an element of damages and a recovery may be had therefor," and noting that such contracts include "noncommercial contracts, ... or contracts involving rights cherished, dignities respected, and emotions recognized by all as both sacred and personal").

In this Court's view, it seems entirely foreseeable that, when disabled individuals are denied the benefits of programs or services by a public entity or a recipient of federal funds, the aggrieved individual will often sustain emotionally harm. *See, e.g.,* 42 U.S.C.A. § 12101 (2), (5) (expressing Congress's finding that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"; and "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities"); *see*

15

*also Sheely,* 505 F.3d at 1199 ("As a matter of both common sense and case law, emotional distress is a predictable, and thus foreseeable, consequence of discrimination.") (citing cases discussing same).[2]  Thus, "[u]nder contract law, the notable and longstanding exception permitting emotional damages for breach of personal contracts sharply distinguishes the emotional damages [the plaintiff] seeks from the punitive damages the Supreme Court refused to award . . . in *Barnes.*[1]"  *Id.* at 1202 (footnote omitted).

In *Barnes,* the Supreme Court also expressed concern about the "indeterminate" nature of punitive damages, noting that "the scope of potential damages liability is one of the most significant factors a school would consider in deciding whether to receive federal funds."  536 U.S. at 188 (internal quotation marks and citation omitted).  But unlike punitive damages, emotional distress damages "bear a significant and altogether determinable relationship to events in which the defendant entity participated and could have foreseen."  *Sheely,* 505 F.3d at 1199-1200.  Consequently, emotional distress damages, unlike punitive damages, do not "range in orders of indeterminate magnitude untethered to compensable harm," and thus, do not "pose a concern that recipients of federal funding could not reasonably have anticipated."  *Barnes,* 536 U.S. at 190-91 (Souter, J. concurring).

---

[2] Both the School District and the *Cummings* Court have expressed the criticism that the *Sheely* decision improperly conflates the foreseeability of emotional injury with the foreseeability that a funding recipient will be held liable for such harm.  While the latter "foreseeability" inquiry is relevant and appropriate under *Barnes*, the former supposedly is not.  But under the longstanding rule governing emotional distress damages in contract actions, the two inquiries merge because recovery for emotional harm is permissible when "the contract or the breach is of such a kind that serious emotional disturbance as a particularly likely result." Restatement (Second) of Contracts §353.  The likelihood (or foreseeability) of the breaching party's liability, in other words, is predicated on the likelihood (or foreseeability) of emotional injury.

Given all of the foregoing considerations, this Court is of the view that public entities and federal funding recipients have fair notice of their potential liability for resulting emotional harm when they intentionally violate the provisions of the ADA or the RA.  Allowing the recovery for emotional harm in such situations is thus fully consistent with the Supreme Court's Title VI jurisprudence, including the principles discussed in *Barnes*.

Page | 17

Accordingly, this Court holds that Title II of the ADA and Section 504 of the RA allow plaintiffs to recover damages for emotional harm where there is evidence of intentional discrimination.  Because the facts alleged in the complaint could plausibly support a claim of intentional discrimination under Title II of the ADA and Section 504 of the RA, Plaintiff has stated a plausible basis for the recovery of noneconomic damages.

### IV.    Conclusion

Based upon the foregoing reasons, the Defendant's motion to dismiss the complaint will be denied.   An appropriate order follows.

Susan Paradise Baxter
United States District Judge

17